STANISLAUS LAWRENCE LAKTAS,
 # R-12404,

        **Plaintiff,**

    vs.                           Case No. 18-cv-1299-DRH

WEXFORD HEALTH SOURCES, INC.,
V. SHAH,
MICHAEL SCOTT,
DR. BUTALID,
CHRISTINE BROWN,
DR. MATTRICK,
and LOUIS SHICKER,

        **Defendants.**

## MEMORANDUM AND ORDER

**HERNDON, District Judge:**

Plaintiff, currently incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendants have been deliberately indifferent to his serious medical conditions. This case is now before the Court for a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A.

Under § 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). The Court must dismiss any portion of the complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief. 28 U.S.C. § 1915A(b).

1

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that "no reasonable person could suppose to have any merit." *Lee v. Clinton*, 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id*. at 557. Conversely, a complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept factual allegations as true, *see Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011), some factual allegations may be so sketchy or implausible that they fail to provide sufficient notice of a plaintiff's claim. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, Courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Id*. At the same time, however, the factual allegations of a *pro se* complaint are to be liberally construed. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

Applying these standards, the Court finds that Plaintiff's claims survive threshold review under § 1915A.

## The Complaint

By way of background, Plaintiff states that he suffered a broken neck and damaged spine in an accident while in the Rock Island County Jail. He was transferred to IDOC (Illinois Department of Corrections) custody in May 2002 with those injuries. (Doc. 1, p. 5). In September 2007, while Plaintiff was incarcerated at Menard Correctional Center, he had surgery to place 3 titanium plates in his neck and to fuse the broken vertebrae. (Doc. 1, p. 6).

For the next 2 years, Menard doctors tried unsuccessfully to manage Plaintiff's severe pain (a consistent 7-8 level on a scale of 10) with medications. In August 2009, Plaintiff had 2 more surgical procedures at an outside hospital, where a neurostimulation system manufactured by Medtronic, Inc., was implanted in his abdomen. This system was effective in relieving Plaintiff's pain. It included a 2-piece wireless hand-held device which allowed Plaintiff to reprogram the implant's settings for conditions such as traveling in his wheelchair over a bumpy sidewalk, or moving from a prone position to a seated one. (Doc. 1, pp. 7-8). The unit required periodic maintenance, including battery replacement and rebooting, and might need total replacement at some point. The hand-held unit had a display to notify the user when the device needed to be serviced. A technician was available to respond within 72 hours to any request for servicing of the neurostimulation unit.

In August 2011, Plaintiff was transferred to Pinckneyville. Well into 2014, his neurostimulation system continued to work to reduce his pain by 40-60%

3

from the level he endured without the implant. (Doc. 1, p. 7). However, on October 13, 2014, Plaintiff notified Dr. Shah that the device was malfunctioning and his pain level was increasing. (Doc. 1, p. 8). Dr. Shah did not see Plaintiff until November 10, 2014, and would not allow Plaintiff to explain his condition or his history with the device. By this time, Plaintiff's pain levels were consistently back up to 7-8, and sometimes 9 or 10 when traveling over rough ground in his wheelchair. Dr. Shah told Plaintiff he would check his records and get back to him.

On November 21, 2014, Plaintiff returned to Dr. Shah for a follow-up consultation, but Shah had not yet reviewed Plaintiff's medical records and took no action regarding Plaintiff's situation. On November 24, 2014, Plaintiff wrote to Christine Brown (Pinckneyville Health Care Administrator), explaining his need to have the implant system serviced, and pointing out Dr. Shah's failure to address his condition. (Doc. 1, p. 8). Brown took no action in response to this letter. (Doc. 1, p. 19). On December 12, 2014, Plaintiff wrote to his counselor about the problem, explaining that the implant was malfunctioning and he was in excruciating pain. (Doc. 1, p. 8).

On December 16, 2014, Dr. Shah informed Plaintiff that he would be sent on a medical furlough to have the unit serviced. (Doc. 1, p. 9). However, on December 26, 2014, Dr. Shah called Plaintiff back in to say that he and Wexford Health Services, Inc., ("Wexford") had concluded that Plaintiff "was getting along fine without the device." *Id.* Shah prescribed Ultram for pain relief.

In January 2015, Plaintiff wrote to Medtronic, Inc., requesting servicing of the implant. Plaintiff informed Shah on January 11 and 14, 2015, that the Ultram was ineffective and was causing dizziness; he again requested the implant be serviced because his pain was nearly unbearable. (Doc. 1, p. 9).

In February 2015, Plaintiff saw a physical therapist, who diagnosed him with a serious carpal tunnel condition and recommended treatment for that as well as service for the neurostimulation implant. (Doc. 1, p. 10). Soon thereafter, Dr. Mattrick (Regional Medical Director) agreed that Plaintiff needed carpal tunnel surgery as well as repair of the implant, stating that "No one, not even an inmate, should have to beg to have medical issues treated." *Id.* However, Mattrick failed to schedule Plaintiff for the surgery. (Doc. 1, p. 19).

Also in February 2015, Plaintiff wrote to the Health Care Unit to say that his 8-year-old neck brace had deteriorated to the point of ineffectiveness. (Doc. 1, p. 10).

On March 5, 2015, Shah informed Plaintiff that he would be sent to see a neurosurgeon for the carpal tunnel and shoulder issues; that he was recommending replacement of the neck brace; and that a Medtronics technician would service the neurostimulation implant. (Doc. 1, p. 10). On March 25, 2015, Plaintiff went to the Brain and Spinal Cord Center in Carbondale, where a Medtronic technician reset the implant and replaced the hand-held unit. Both the hand-held device and the antenna had been "dead" for, he estimated, 161 days. A replacement antenna would be mailed to Pinckneyville. The technician noted that

if a problem occurred, the doctor could call Medtronic, and someone would come out to service the unit within 72 hours. Plaintiff learned that he had not been scheduled to see a neurosurgeon after all for his carpal tunnel problem.

On April 11, 2015, the implant malfunctioned again, and Plaintiff could not control the settings. His pain level went back up to 7 or higher on a scale of 10. Plaintiff wrote to the Health Care Unit numerous times between April 11 and October 18, 2015 asking for pain relief and servicing of the implant, to no avail. (Doc. 1, p. 11).

Plaintiff wrote to Dr. Shicker (the IDOC Health Care Director) on October 19, 2015, detailing his history of problems with his "medical issues" and the lack of response by Pinckneyville staff. (Doc. 1, pp. 11-12). Dr. Shicker took no action in response. (Doc. 1, p. 20).

On November 16, 2015, Plaintiff went back to the Brain and Spinal Cord Center, where Dr. Bryant confirmed that Plaintiff was in serious need of carpal tunnel surgery, and had a growth on his shoulder that should be removed. (Doc. 1, p. 12).

On December 1, 2015, Dr. Shah told Plaintiff that nothing would be done about the neurostimulation device because his "issues are not life-threatening." (Doc. 1, p. 12). Shah refused to do anything about Plaintiff's severe pain.

On February 5, 2016, Plaintiff met with Dr. Scott for the first time. Scott refused to discuss the neurostimulation device, and confiscated Plaintiff's hand-held control unit. Scott then reduced Plaintiff's Ibuprofen prescription from 800

mg twice daily, to 400 mg once per day. (Doc. 1, pp. 12-13). That same day, Plaintiff went back to the Brain and Spinal Cord Center, where another doctor (Dr. Vargas) confirmed he needed carpal tunnel surgery on both elbows and his left wrist.

In March 2016, a nurse practitioner (Rector) told Plaintiff that he had been scheduled to see a neurosurgeon about the carpal tunnel condition, as well as an eye surgeon. However, somebody had "intentionally buried [Plaintiff's] file." (Doc. 1, p. 13). She would try to reschedule those visits.

On October 14, 2016, Dr. Scott told Plaintiff that nothing would be done to repair the neurostimulation system, and he would not have carpal tunnel surgery. Scott told Plaintiff he should be "ecstatic" that Pinckneyville provides him with a wheelchair and an attendant. (Doc. 1, p. 13). Scott acknowledged that Plaintiff was suffering pain, but said, "pain is not life-threatening, and I am not responsible for making you comfortable." *Id.*

One year later, on October 23, 2017, Plaintiff returned to the Brain and Spinal Cord Center, where Dr. Bryant expressed concern that Plaintiff had still not been given the surgery that Dr. Bryant recommended 1-1/2 years previously. He recommended surgery for both the spine and carpal tunnel conditions, which had become worse. In November 2017, Plaintiff went to a Rehabilitation Clinic in Herrin, Illinois, where a doctor concluded that Plaintiff's serious condition warranted the surgery recommended by Dr. Bryant. (Doc. 1, p. 14).

On March 15, 2018, Plaintiff told Dr. Butalid that his pain medication was

ineffective and had negative side effects. Butalid agreed that Plaintiff's records showed he needed surgery, but he could not schedule it until Wexford first gave approval, and they were waiting for test results to come in. (Doc. 1, p. 14). On March 21, 2018, Plaintiff learned from a nurse practitioner (Bob) that Dr. Bryant (of the Brain and Spine Clinic) now recommended an "advanced specialist" because Plaintiff's condition had "progressed beyond their capabilities." (Doc. 1, p. 15). Wexford had still not made a decision regarding surgery. Nothing new was done for Plaintiff's pain.

On March 29, 2018, Dr. Butalid briefly examined Plaintiff again, but refused to discuss his pain or other issues. Butalid said he was forwarding Plaintiff's file to Wexford. On April 2, 2018, nurse practitioner Bob told Plaintiff there was no news from Wexford, and ordered him an egg crate mattress to help with his pain. (Doc. 1, p. 16).

Plaintiff asserts that Wexford has a policy and practice to order redundant tests in order to delay treatment which was recommended as a result of the original tests, and this constitutes deliberate indifference to Plaintiff's serious, long-term medical needs. (Doc. 1, p. 18).

Plaintiff seeks an injunction requiring Wexford or its agents to provide him with the recommended carpal tunnel surgery, and to repair or replace the neurostimulation pain-relief system that was implanted in August 2009 with Wexford's approval. He also seeks declaratory relief, and compensatory and punitive damages. (Doc. 1, pp. 20-22).

8

**<u>Merits Review Pursuant to 28 U.S.C. § 1915A</u>**

Based on the allegations of the Complaint, the Court finds it convenient to divide the *pro se* action into the following counts. The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. The designation of these counts does not constitute an opinion as to their merit. Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice.

> **Count 1:** Eighth Amendment deliberate indifference claim against Shah, Scott, and Butalid, for failing to provide treatment for Plaintiff's pain, including failing to request servicing of his implanted neurostimulation device;
>
> **Count 2:** Eighth Amendment deliberate indifference claim against Shah, Scott, Butalid, and Mattrick, for failing to refer Plaintiff for carpal tunnel surgery;
>
> **Count 3:** Eighth Amendment deliberate indifference claim against Wexford Health Sources, Inc., for failing to have Plaintiff's implant serviced, and for delaying and failing to approve Plaintiff's recommended carpal tunnel surgery;
>
> **Count 4:** Eighth Amendment deliberate indifference claim against Brown and Shicker, for failing to take any action to assist Plaintiff in obtaining pain relief or servicing of his neurostimulation implant after Plaintiff wrote to them about the other Defendants' lack of care; and against Shicker for failing to take action regarding Plaintiff's need for carpal tunnel surgery.

Accepting Plaintiff's allegations as true, each of these claims shall receive further review.

**Deliberate Indifference to a Serious Medical Need**

"A prisoner's claim for deliberate indifference must establish (1) an

9

objectively serious medical condition; and (2) an official's deliberate indifference to that condition. Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Delaying treatment may constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (internal citations and quotations omitted). *See also Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

Plaintiff's neck and spinal condition caused him continuous and significant pain. Both this condition and the carpal tunnel condition satisfy the objective component of a deliberate indifference claim. *See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (an objectively serious condition includes an ailment that significantly affects an individual's daily activities or which involves chronic and substantial pain).

**Count 1 – Failure to Provide Pain Relief or Service Neurostimulation Implant**

Plaintiff has sufficiently alleged that Dr. Shah, Dr. Scott, and Dr. Butalid were well informed about his ongoing and serious pain, as well as the availability of a technician to service and repair the pain-relief implant as needed. Despite this knowledge, these Defendants delayed and/or failed to arrange for servicing of the implant, and failed to provide Plaintiff with medication to adequately treat his pain. As a result, Plaintiff has had no effective pain relief for nearly the entire period from October 2014 to the present. **Count 1** shall therefore proceed for

further consideration against Shah, Scott, and Butalid.

**Count 2 – Denial/Delay of Carpal Tunnel Surgery**

Plaintiff consulted Dr. Mattrick and Dr. Shah in early 2015 regarding his need for carpal tunnel surgery. Mattrick agreed that Plaintiff needed the surgery, but failed to schedule it or take other necessary steps for Plaintiff to have surgery. Shah told Plaintiff in March 2015 that he would be sent to a neurosurgeon, but he did not see one until November 2015, and the surgery never took place under Shah's care.

After another specialist recommended carpal tunnel surgery in February 2016, Dr. Scott refused to schedule or seek approval for the surgery in October 2016.

Surgery was again recommended in October and November 2017 by 2 consulting doctors. After a nearly 5 month delay, in March 2018 Dr. Butalid apparently requested approval from Wexford for Plaintiff to have the carpal tunnel surgery. By that time, Plaintiff's condition had deteriorated to the point that he would need treatment by an "advanced specialist."

Plaintiff's Complaint indicates that he still has not been approved for the carpal tunnel surgery. Based on the facts presented, Plaintiff may proceed with **Count 2** against Shah, Mattrick, Scott, and Butalid, for denying and delaying surgery for the carpal tunnel condition.

**Count 3 – Wexford**

Defendant Wexford Health Sources, Inc., ("Wexford") is a corporation that

employs Defendants Shah, Scott, Butalid, and Mattrick, and provides medical care at the prison, but it cannot be held liable solely on that basis. A corporation can be held liable for deliberate indifference only if it had a policy or practice that caused the alleged violation of a constitutional right. *Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). *See also Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002) (private corporation is treated as though it were a municipal entity in a § 1983 action).

Here, Plaintiff has alleged that Wexford's policy of ordering superfluous testing caused some of the delay in approving or scheduling him for carpal tunnel surgery. Additionally, he claims that Dr. Butalid was prevented from scheduling the surgery that Butalid and other physicians determined was necessary, because he could not do so without Wexford's approval. At this stage, these allegations support a claim that Plaintiff was unable to be scheduled for surgery because of an official policy espoused by Defendant Wexford, at least for the period beginning in March 2018, when Dr. Butalid began the process of seeking Wexford's approval.

In addition, in December 2014 when Dr. Shah refused to arrange for Plaintiff's neurostimulation unit to be serviced, he told Plaintiff that he and Wexford determined that Plaintiff "was getting along fine without the device." (Doc. 1, p. 9). Wexford's decision thus appears to have contributed to Plaintiff's inability to have the implanted device restored to service.

**Count 3** may therefore proceed against Wexford.

**Count 4 – Failure to Intervene to Provide Treatment**

Pinckneyville Health Care Administrator Brown did not directly provide treatment to Plaintiff. Plaintiff alleges that she was responsible for ensuring that the doctors under her supervision provided adequate medical care. This alone is not enough to impose liability on her, because the doctrine of *respondeat superior* (supervisory liability) is not applicable to § 1983 actions. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). However, if an administrator is sufficiently informed of a prisoner's serious medical condition and the failure of medical providers to render adequate care, yet fails to intervene on the prisoner's behalf, that administrator may be found to be deliberately indifferent to the prisoner's condition. *See Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) (prisoner could proceed with deliberate indifference claim against non-medical prison officials who failed to intervene despite their knowledge of his serious medical condition and inadequate medical care, as explained in his "coherent and highly detailed grievances and other correspondences").

Plaintiff claims that he wrote a letter of complaint to Brown in November 2014, after Dr. Shah failed to take any steps to have Plaintiff's neurostimulation pain-relief implant serviced for over one month. (Doc. 1, p. 8). Taking Plaintiff's factual statements as true, his letter to Brown may have sufficiently informed her of the need for prompt attention to get the implant back in working condition. He alleges that Brown did nothing to address the problem, and he was not sent to a Medtronic technician until March 2015. At this stage, Plaintiff may proceed with

his deliberate indifference claim against Brown in **Count 4**.

Finally, Plaintiff alleges that he wrote to IDOC Medical Director Shicker in October 2015, "detailed the history of the problems" he had been experiencing at Pinckneyville with the lack of attention to his medical conditions, and "begged Defendant Shicker to step in and help." (Doc. 1, pp. 11-12). At that time, Plaintiff's medical conditions included his severe pain and inoperable neurostimulation unit, as well as his need for carpal tunnel surgery, which had been recommended by Mattick back in February 2015. It is plausible that this letter sufficiently placed Shicker on notice of the failure of Pinckneyville officials to address both of Plaintiff's serious conditions for a period of many months, yet Shicker allegedly took no steps to ensure that Plaintiff would be evaluated or treated. Accordingly, **Count 4** shall also proceed against Shicker.

## Pending Motions

Plaintiff's motion for recruitment of counsel (Doc. 3) is referred to the United States Magistrate Judge for further consideration.

The motion for service of process at government expense (Doc. 4), while unnecessary for Plaintiff because he has been authorized to proceed *in forma pauperis*, is **GRANTED.** Service shall be ordered below.

## Disposition

The Clerk of Court shall prepare for Defendants **WEXFORD HEALTH SOURCES, INC., SHAH, SCOTT, BUTALID, BROWN, MATTRICK,** and **SHICKER**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a

14

Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that Defendant, and the Court will require that Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a Defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to a United States Magistrate Judge for further pre-trial proceedings, which shall include a determination on the pending motion for recruitment of counsel (Doc. 3).

Further, this entire matter shall be **REFERRED** to the United States

Magistrate Judge for disposition, pursuant to Local Rule 72.2(b)(3) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

    **IT IS SO ORDERED.**

Judge Herndon
2018.07.20
15:39:46 -05'00'

**United States District Judge**

16